Brian M. Holm (Cal. State Bar No. 255691)
HOLM LAW GROUP, PC
171 Saxony Road, Suite 203
Encinitas, California 92024
p. 858.433.2001 f. 888.483.3323
brian@holmlawgroup.com

John J. O'Brien (Cal. State Bar No. 253392)
THORSNES BARTOLOTTA MCGUIRE, LLP
2550 Fifth Avenue, 11th Floor
San Diego, California 92103
p. 619.236.9363  f. 619.236.9653
obrien@tbmlawyers.com

Christpher R. Dryden (Cal. State Bar No. 234476)
James C. Huber (Cal. State Bar No. 269488)
GLOBAL LEGAL LAW FIRM
322 Encinitas Boulevard, Ste 200
Encinitas, California 92024
p. 888-846-8901  f. 888-846-8902
cdryden@attorneygl.com | jhuber@attorneygl.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE NO. 1, individually, and on behalf of all others similarly situated; and JANE DOE NO. 2, individually, and on behalf of all others similarly situated, JANE DOE NO. 3, individually, and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>CCBILL, LLC, an Arizona limited liability company; EPOCH.COM, LLC, a California limited liability company, FIRST DATA MERCHANT SERVICES, LLC, a Florida limited liability company; TOTAL SYSTEM SERVICES, LLC, a Delaware corporation, and BANK DOE(S) 1 - 10, inclusive;<br><br>            Defendants. | **CLASS ACTION COMPLAINT FOR DAMAGES AND ATTORNEY FEES PURSUANT TO 18 U.S.C. § 1595**<br><br>DEMAND FOR JURY TRIAL<br><br>**'25CV2721 AGS KSC** |

Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3, individually and on behalf of all others similarly situated **(collectively, "Plaintiffs")**, hereby allege as follows:

### I.

### <u>SUMMARY OF CLAIMS</u>

1.    In 2003, the United States Congress gave sex trafficking victims the right to bring civil actions against their traffickers when it enacted 18 U.S.C. § 1595 **("Section 1595")**.  A few years later, Congress expanded Section 1595 to allow victims to bring civil actions against their traffickers *and* any person who "benefits…from participation in a venture which that person knew or should have known[1] has [engaged in sex trafficking]."  By broadening liability in this way, Congress intended to force an otherwise lawful business to make a decision when it suspects a customer is using its services in furtherance of a sex trafficking venture: (a) *voluntarily* stop providing services to suspected traffickers, or (b) turn a blind eye, keep profiting from the suspected traffickers, but risk civil liability to the victims.  Plaintiffs bring this action because, for over a decade, Defendants chose the latter.

2.    From 2007 until October 2019, Michael Pratt, Matthew Wolfe, Douglas Wiederhold, and Andre Garcia operated a sex trafficking venture known as **"GirlsDoPorn."**[2]  During this time, GirlsDoPorn used a combination of force, fraud, and coercion to get more than five hundred high school and college-aged women to fly to San Diego, California under false pretenses to film pornographic videos.  Once alone in San Diego, GirlsDoPorn used a wide array of coercive tactics to force the victim to film the video, including cancelling returns flights.  GirlsDoPorn commercialized its venture by publishing the illegal videos on its websites behind a paywall accessible by credit card.

---

[1]  "The phrase 'knew or should have known' echoes common language used in describing an objective standard of negligence."  *A.B. v. Marriott Int'l, Inc.*, No. 19-5770, 2020 WL 1939678, at *7 (E.D. PA, Apr. 22, 2020)

[2] The individuals, websites, and the offshore and domestic entities used to operate this sex trafficking venture are collectively referred to herein as **"GirlsDoPorn."**

3.      In June 2016, four victims filed a civil action against GirlsDoPorn in the Superior Court of California, County of San Diego, for, among other things, intentional misrepresentation, concealment, and misappropriation of likeness **("State Court Action")**.  By November 2017, a total of twenty-two plaintiffs had joined in the State Court Action.[3]  The plaintiffs' pleadings, declarations, and exhibits in the State Court Action detailed in great depth the force, fraud, and coercion GirlsDoPorn used as part of its regular business practices. The media covered the case heavily from start to finish.

4.      On August 19, 2019, the State Court Action proceeded to trial before the Honorable Kevin A. Enright.  On October 9, 2019, the United States Attorney for the Southern District of California charged six people connected to GirlsDoPorn with sex trafficking by force, fraud, and coercion under 18 U.S.C. § 1591 **("Section 1591")** and conspiracy to commit sex trafficking by force, fraud, and coercion under 18 U.S.C. § 1594 **("Section 1594")**.  A grand jury indictment, unsealed about one month later, added counts for production of child pornography and sex trafficking of a minor.[4] A few months later, a superseding indictment added ten new counts of sex trafficking by force, fraud, and coercion and a count for money laundering.

5.      On January 2, 2020, the Honorable Kevin A. Enright issued a nearly 200-page statement of decision in the State Court Action detailing the "fraud, intimidation and coercion" GirlsDoPorn used to force its victims to film the videos.[5]  The decision collectively awarded the twenty-two Plaintiffs nearly $13,000,000 in compensatory and punitive damages, voided all contracts as part and parcel of the fraudulent and coercive scheme, and enjoined GirlsDoPorn from using their fraudulent and coercive practices in

---

[3] The complaints from the State Court Action (San Diego Superior Court Case Nos. 37-2016-00019027-CU-FR-CTL, 37-2017-00033321-CU-FR-CTL and 37-2017-00043712-CU-FR-CTL) are hereby incorporated by reference as though set forth fully herein.

[4] The Indictment from *United States v. Pratt*, No. 19:CR-4488-JLS (S.D. Cal. Nov. 7, 2019), ECF No. 34, is hereby incorporated by reference as though set forth fully herein.

[5] Hon. Kevin Enright's Statement of Decision (finalized on April 27, 2020) is incorporated herein by reference.

any future business dealings.  The Plaintiffs were later awarded nearly $8,000,000 in attorney fees and costs, bringing the judgment to over $21,000,000 in total.

6.      Michael Pratt, the owner and ringleader of GirlsDoPorn, escaped through Mexico, earning a spot on the Federal Bureau of Investigation's Top Ten Most Wanted list.  He was arrested in Madrid, Spain, on December 21, 2022, and extradited to this district on March 20, 2024.  To date, six members of GirlsDoPorn have pleaded guilty to sex trafficking crimes.[6] Honorable Janis Sammartino sentenced Michael Pratt to twenty-seven years in prison,[7] Andre Garcia to twenty years in prison,[8] Matthew Wolfe to fourteen years in prison,[9] and Theodore Gyi to four years in prison.  Douglas Wiederhold and Valorie Moser are scheduled to be sentenced on December 5, 2025, and December 12, 2025, respectively.

7.      GirlsDoPorn was undoubtedly a "sex trafficking venture" within the meaning of Sections 1591 and 1595.  Nevertheless, from 2009 until 2019, Defendants knowingly participated in the sex trafficking venture by using its payment network to process payments for the illegal videos on GirlsDoPorn's websites, generating millions in fees for themselves and tens of millions for GirlsDoPorn.  By doing so, Defendants turned the victims' sex acts into "*commercial* sex acts," a crucial element of sex trafficking under Section 1591.  Without Defendants' payment network, GirlsDoPorn would have never been able to exist.

8.      From the very moment Defendants began processing payments for the illicit videos in 2009, Defendants should have known GirlsDoPorn was using force, fraud, and

---

[6] https://www.justice.gov/usao-sdca/pr/girlsdoporn-owner-michael-pratt-pleads-guilty-sex-trafficking

[7] https://www.justice.gov/usao-sdca/pr/girlsdoporn-owner-michael-pratt-sentenced-27-years-sex-trafficking-hundreds-women

[8] *See,* Plea Agreement, *United States v. Pratt*, Case No. 19:CR-4488-JLS (S.D. Cal.) [ECF No. 138]; see also, https://www.justice.gov/usao-sdca/pr/twenty-year-sentence-girlsdoporn-sex-trafficking-conspiracy.

[9] https://www.justice.gov/usao-sdca/pr/friend-and-business-partner-girlsdoporn-owner-michael-pratt-sentenced-14-years-prison

coercion as an integral part of its business practices.  Indeed, when it was launched, GirlsDoPorn's website openly bragged about using fraud to lure a victim under the guise of a modeling advertisement—"**She contacted us regarding an ad[] I had placed for beauty models wanted, having no idea it was actually for adult videos instead ha :)**"

9.      As the years went by, Defendants ignored dozens of red flags indicating GirlsDoPorn was a sex trafficking venture.  By 2017, Defendants could no longer feign ignorance of GirlsDoPorn's illegal business practices because the plaintiffs in the State Court Action served Defendants with a subpoena seeking records related to GirlsDoPorn.  Even after gaining knowledge of the allegations and evidence in the State Court Action, Defendants kept processing payments for the illegal videos until October 2019, when the Department of Justice arrested everyone involved with GirlsDoPorn and took the websites offline.  Only then did Defendants stop processing payments for GirlsDoPorn, but it was not by choice.

10.     Any ignorance Defendants may have had to GirlsDoPorn's illegal business practices prior to October 2019 is a direct result of Defendants' own negligence, recklessness, or willful desire to remain ignorant, which is no defense under Section 1595.  Accordingly, Plaintiffs bring this action against Defendants on behalf of themselves and the GirlsDoPorn Class.

## II.
## PARTIES

A.   <u>LEAD PLAINTIFFS</u>

11.     Plaintiff Jane Doe No. 1 is a United States citizen who resided outside this judicial district when the actions giving rise to her claims occurred.  Jane Doe No. 1 currently resides outside this judicial district.  Jane Doe No. 1 was trafficked by GirlsDoPorn within the last ten years.

12.     Plaintiff Jane Doe No. 2 is a United States citizen who resided outside this judicial district when the actions giving rise to her claims occurred.  Jane Doe No. 2 currently resides inside this judicial district. Jane Doe No. 1 was trafficked by

GirlsDoPorn within the last ten years.

13.    Plaintiff Jane Doe No. 3 is a United States citizen who resided outside this judicial district when the actions giving rise to her claims occurred.  Jane Doe No. 3 currently resides outside this judicial district. Jane Doe No. 3 was trafficked by GirlsDoPorn within the last ten years.

**B.    DEFENDANTS**

14.    Defendant CCBill, LLC **("CCBill")** is a limited liability company incorporated in the State of Arizona with its principal place of business located in Tempe, Arizona.  At all relevant times alleged herein, CCBill did business within the State of California and within this judicial district.  CCBill served as the Independent Sales Organization[10] that serviced the Merchant accounts of GirlsDoPorn, the sex trafficking enterprise subject to this action.

15.    Defendant Epoch.com, LLC **("Epoch")** is a limited liability company incorporated in the State of California with its principal place of business located in Santa Monica, California.  At all relevant times, Epoch did business within the State of California and within this judicial district.  Epoch served as the Payment Facilitator for GirlsDoPorn's Submerchant accounts.

16.    Defendant First Data Merchant Services, LLC **("First Data")** is a limited liability company incorporated in the State of Florida with a principal place of business in the State of Georgia.  First Data is a wholly owned subsidiary of Fiserv, Inc., which maintains the largest market share of Merchant Service Providers, accounting for about 42% of all banks and 31% of all credit unions.  First Data handles approximately 45% of all Credit Card transactions in the United States and maintains partnerships with over six million Merchants, the largest in the payments industry.  At all relevant times, First Data did business within the State of California and within this judicial district.

---

[10] The capitalized terms in this section are defined below in Section IV ("Summary of Claims") and VI Section ("Factual Background").

17.     Defendant Total System Services, Inc. ("**TSYS**") is a Georgia corporation with a principal place of business in Columbus, Georgia.  At all relevant times, TSYS did business within the State of California and within this judicial district.  TSYS is the largest third-party Payment Processor for Issuing Banks in North America, with approximately 40% of the market share.

18.     Plaintiffs are unaware of the true names of the Member Banks **(the "Bank Does")** that settled the transactions of GirlsDoPorn's Merchant accounts.   Plaintiffs will amend this Complaint to join the Bank Does when Plaintiffs ascertain their names, capacities, and liabilities.

19.     At all material times, CCBill, Epoch, First Data, TSYS, and the Bank Does **("Defendants")** were the agent, servant, employee, partner, joint venturer, representative, subsidiary, parent, affiliate, alter ego, and/or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged activities herein, and in doing the things alleged, each was acting within the scope of such agency, service, affiliation, employment, partnership, joint venture, representation, and/or conspiracy, and so each is legally responsible for the acts and omissions of the others.

### III.
### JURISDICTION AND VENUE

**A.    SUBJECT MATTER JURISDICTION**

20.     This Court has original subject matter jurisdiction over the private right of action for victims of sex trafficking under 28 U.S.C. § 1331.

21.     Plaintiffs' claims arise under 18 U.S.C. § 1595, which states that "[a]n individual who is a victim of a violation of this chapter may bring a civil action . . . in an appropriate district court of the United States. . . ."  18 U.S.C. § 1595(a).

**B.    PERSONAL JURISDICTION**

22.     This Court has personal jurisdiction over all Defendants.  Defendants have minimum contacts with California such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.  Defendants have each purposefully

availed themselves of California jurisdiction; there is a substantial nexus between Plaintiffs' claims and Defendants' California-based activities, and jurisdiction is fair. Epoch is domiciled and maintains its principal place of business in the State of California.

23.    More specifically, by operating payment networks and transacting various forms of business related thereto in California (*e.g.* contracting with California residents and knowingly and repeatedly transmitting currency to and from California), Defendants purposefully availed themselves of doing business in California.  Among other things, the Defendants purposefully: (a) directed their activities at California residents; (b) derived benefit from their activities in California; (c) created a substantial connection with California; (d) engaged in significant activities within California; (e) created continuing obligations between themselves and residents of California; and (f) caused liability-producing acts and foreseeable consequences in California.

24.    Finally, Defendants contracted and partnered with the forum-based perpetrators of the subject sex trafficking, GirlsDoPorn, and helped those traffickers commercialize their crimes by using Defendants' payment network to generate revenue from their trafficking activities.  Plaintiffs are informed and believe that an overwhelming majority, if not all, $17 million in revenues generated by the GirlsDoPorn sex trafficking venture were processed by Defendants.

C.    **VENUE**

25.    Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (d), in that a substantial part of the events or omissions giving rise to the claims occurred in this District, and the corporate Defendants are subject to personal jurisdiction in this District. Particularly, the subject sex trafficking actions occurred in San Diego, California.  Many of the GirlsDoPorn perpetrators were prosecuted for sex trafficking in this District. Further, Defendants contracted and maintained a business partnership with the GirlsDoPorn perpetrators of the subject sex trafficking within this District and made

payments to financial institutions within this District as part of that relationship.  Finally, Jane Doe No. 2 resides within this District.

## IV.
## CLASS ALLEGATIONS

26.    Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3). The nationwide class is titled the "**GirlsDoPorn Class**" (also referred herein simply as "**Class**") and is defined as follows:

> **All persons who appeared in at least one pornographic video on the websites www.girlsdoporn.com and/or www.girlsdotoys.com, between 2009 and 2019.  Excluded from the class are Defendants, their affiliates, employees, officers, and directors, persons, and entities.**

27.    Plaintiffs reserve the right to amend the **GirlsDoPorn Class** definition if discovery and further investigation warrant.

28.    This action is properly brought as a class action under Federal Rule of Civil Procedure 23(a) for the following reasons:

- **Numerosity (Fed. R. Civ. P. 23(a)(1)):** The proposed GirlsDoPorn Class is so numerous and geographically dispersed throughout the United States and Canada that the joinder of all class members is impracticable. While Plaintiffs do not know the exact number and identity of the GirlsDoPorn Class, Plaintiffs are informed and believe that there are over three hundred class members.  The precise number of class members may be ascertained through discovery.

- **Commonality (Fed. R. Civ. P. 23(a)(2)):** There are common questions of law and fact common to the proposed class, including, but not limited to:

  i.    Whether GirlsDoPorn was a sex trafficking venture pursuant to Sections 1591 and 1595;

> ii.     Whether Defendants knew, or should have known, GirlsDoPorn was a sex trafficking venture;
>
> iii.    Whether Defendants knowingly participated in GirlsDoPorn's sex trafficking venture;
>
> iv.     Whether Defendants knowingly benefitted from GirlsDoPorn's sex trafficking venture;
>
> v.      Whether Defendants' conduct or inaction proximately caused Plaintiffs' harm; and
>
> vi.     The measure of punitive damages, attorney fees, and Defendants' restitution, and whether injunctive relief is appropriate.

- **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of the claims of the GirlsDoPorn Class.  Plaintiffs and the class have been injured by the same wrongful practices of Defendants.  Their claims arise from the same practices and conduct that give rise to the claims of the class and are based on the same legal theories; and

- **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs will fairly and adequately protect the interests of the GirlsDoPorn Class in that they have no interests antagonistic to those of the other members of class, and they have retained attorneys experienced in class actions, complex litigation, and litigation regarding GirlsDoPorn, including Plaintiffs' attorneys from the State Court Action.

29.    Class status is further proper pursuant to Federal Rule of Civil Procedure 23(b)(2) [**Injunctive Relief**] because Defendants continue to process payments and earn fees for websites that still publish the victims' videos.

30.    Moreover, this action is properly brought as a class action under Federal Rule of Civil Procedure 23(b)(3) [**Predomination and Superiority**] because questions

of law and/or fact common to the GirlsDoPorn Class predominate over questions affecting the individual members of the GirlsDoPorn Class and, on balance, a class action is superior to the other methods available for adjudicating the controversy.  Class action treatment here achieves economies of time, effort, and expense as compared to separate lawsuits, permits adjudication of the dispute that cannot be economically litigated individually, and avoids inconsistent outcomes, because the same issues can be adjudicated the same way for the entire class.

31.    Substantively, predominance exists under Rule 23(b)(3) because all members of the GirlsDoPorn Class will have to prove the same elements of the same federal sex trafficking private right of action, pursuant to Section 1595, including whether:

- GirlsDoPorn was a sex trafficking venture;
- the class member is a victim of GirlsDoPorn's sex trafficking venture;
- Defendants knew, acted in reckless disregard of the fact that, or, at the bare minimum, should have known GirlsDoPorn operated a sex trafficking venture;
- Defendants participated in GirlsDoPorn's sex trafficking venture;
- Defendants knowingly benefitted from GirlsDoPorn's sex trafficking venture;
- Plaintiffs have suffered damages as a proximate result of Defendants' participation in GirlsDoPorn's sex trafficking venture; and
- Defendants' actions entitle the Plaintiffs to punitive damages.  (*See*, *infra*, Section VI.)

32.    Also supporting Rule 23(b)(3) predominance, while Plaintiffs dispute there are any viable defenses, Defendants' anticipated defenses will be common to all class members, including, whether: (a) Plaintiffs can state and prove each element of their Section 1595 claim [particularly, the Defendants' knowledge of and participation in the sex trafficking venture]; and/or (b) Defendants' alleged immunities under the

Communications Decency Act [47 U.S.C. § 230]. And Defendants may file a counterclaim against GirlsDoPorn and its owners, operators, or other agents and representatives.

33. Finally, a class action is superior to other available methods for the fair and efficient adjudication of this controversy, pursuant to Rule 23(b)(3), for at least the following reasons:

- No individual class members have expressed an interest in individually controlling the prosecution of separate actions;
- No other litigation concerning this controversy exists;
- It is highly desirable to concentrate this litigation in this particular forum because this district is where: GirlsDoPorn operated, the GirlsDoPorn owners and agents are in custody and/or have been -- or are getting -- prosecuted, Defendants entered into an agreement with GirlsDoPorn, Defendants sent GirlsDoPorn revenue, the State Court Action took place, many witnesses reside (including GirlsDoPorn ex-employees, agents, and representatives), and many of the Plaintiffs reside.

34. This proposed class action is manageable because it is not more than 500 hundred victims, the only potential variances among the claims may be for individualized damages, which separate hearings easily resolve, and finally, the GirlsDoPorn Class is ascertainable because it is sufficiently well-defined to permit meaningful notice and identification (*e.g.*, Plaintiffs, GirlsDoPorn and its agents, and/or the United States Attorney for the Southern District of California have access to the address and/or other contact information for the class members).

## V.

## FACTUAL BACKGROUND

A. **PARTIES AND DUTIES IN THE CREDIT CARD PAYMENT PROCESSING INDUSTRY**

35. The Credit Card payment processing industry is complex. It involves a

multitude of parties acting along a chain of distribution, whose duties are determined by private contracts, private regulations, and industry customs.  Indemnification agreements further seek to shift liability down the chain of distribution; however, each party along the chain of distribution has duties to monitor and confirm the transactions.

36.    The main parties and terminology in the payments industry are:

- **Acquirer:** Bank authorized to accept Credit Card payments.
- **Card Brand**: Major Credit Card network, *e.g.*, Visa and Mastercard.
- **Card Brand Network**:  Infrastructure that Card Brands provide to Merchants in order to accept Credit Card transactions.
- **Card Brand Rules**: Rules Card Brands set that all participants in the chain of distribution must follow to use Card Brands.
- **Cardholder**:  Initiator of Credit Card payments.
- **Credit Card**: Plastic or other card Cardholders use to pay for goods or services – for purposes here, also includes debit cards and other payment cards.
- **Independent Sales Organization ("ISO"):** Company that promotes Credit Card processing services and brokers processing agreements.
- **Issuing Bank**: Bank authorized to issue Credit Cards to Cardholders for payments.
- **Member Bank**: Both Acquiring Banks and Issuing Banks registered with the respective Card Brands and Card Brand Networks.
- **Merchant**: Business that accepts Credit Card Payments from Cardholders for goods and services.
- **Merchant Account**: Bank account that enables businesses to accept and process Credit Card payments from Cardholders.
- **Merchant Service Providers**: Include both Payment Facilitators and Payment Processors.
- **Payment Facilitator ("PayFac"):** Company that allows Merchants to

accept Credit Cards, often online through software platforms.

- **Payment Processors**:  Company that allows traditional Credit Card transactions between Merchants and Member Banks.

- **Submerchant**: Company that accepts payments through a Payment Facilitator, using its established Merchant Account.

37.     The parties' duties and responsibilities in the payments chain of distribution include, without limitation:

- **ISOs and PayFac Duties:** ISOs and PayFacs must conduct ongoing risk management, monitor Merchant activity, and ensure compliance with applicable laws and guidelines.  ISOs and PayFacs have enhanced due diligence requirements for high-risk Merchants, *e.g.*, Internet pornography, which may include secret shopping, website reviews, and financial checks.

- **Card Brand Rules**: Card Brands require Acquiring Banks to be accountable for their Merchants' transactions and have a non-delegable duty to underwrite and risk manage, even when working with Payment Processors or other third-party organizations.

- **Industry Guidelines**. The Electronic Transactions Association (ETA) sets best practices for risk management, underwriting, and monitoring of Merchants and third-party organizations:

  o   **ETA ISO Guidelines** – ISOs are required to enhance review of high-risk Merchants and marketing practices, *e.g.*, Internet Pornography.

  o   **ETA PayFac Guidelines** – PayFacs are required to maintain lists of prohibited Merchants and perform due diligence on Submerchants.

- **Bank Duties:** Acquiring Banks, Issuing Banks, Members Banks have regulatory obligations under federal law, including risk monitoring of

third-party organizations like ISOs and PayFacs.

38.     The Card Brand Rules and Acquirer guidance require continuous oversight of Payment Facilitators and Submerchants (including adult-content merchants) in initial underwriting, ongoing monitoring, and termination where risk indicators appear. For example, Visa instructs Acquirers that they "must continuously monitor payment facilitators … and underlying sponsored merchants" for compliance with Visa Core Rules, Global Acquirer Risk Standard, and applicable law, and to ensure such merchants "do not pose an undue risk to the integrity of the Visa payment system." Mastercard likewise imposes enhanced standards for adult-content merchants, including controls to monitor, block, and take down illegal content, and requires Acquirers to certify those controls are in place.

39.     ETA Underwriting and Risk Monitoring Guidelines, reflecting network rules and regulatory expectations, also call for enhanced diligence for high-risk verticals (including adult-content websites and pornography), with measures, such as "secret shopping," site reviews, marketing-practice vetting, chargeback surveillance, and rapid escalation of red flags.

**B.    GirlsDoPorn Was a Sex Trafficking Venture From 2007 Until 2019**

40.     GirlsDoPorn started in 2006 when Pratt bought the domain GirlsDoPorn.com and set out to create a paysite featuring eighteen to twenty-two-year-old women who had never appeared in a pornographic video before and did not plan to do so again.  GirlsDoPorn later advertised its videos as: "Real amateur girls having sex on video for the very first time . . . You will not find these girls on any other website – all girls are 100% exclusive – this is the only [sic] and only time they do porn."

41.     From 2007 until 2009, Pratt and Wiederhold traveled around the United States filming pornographic videos in hotel rooms, with Pratt as the videographer and Wiederhold as the male actor.  In July 2009, Pratt launched the GirlsDoPorn.com website after he and Wiederhold had amassed enough videos.  The two continued to film victims together for the next two years.  In 2011, Pratt's childhood friend from New Zealand,

Wolfe, joined Pratt and Wiederhold.  Around this same time, Garcia replaced Wiederhold as the male actor, and Wiederhold began focusing on a similar website featuring older female victims, MomPOV.com, that, like GirlsDoPorn, used fraud and coercion as part of its regular business practices.[11]

### i.    GirlsDoPorn's Fraudulent Recruiting Practices

42.    GirlsDoPorn's niche was to film eighteen to twenty-two-year-old "girls next door" having sex who will never appear in another pornographic video.  Consequently, GirlsDoPorn's success turned on its ability to induce a high volume of everyday high school and college-aged women with zero interest in filming Internet pornography to fly to San Diego and shoot a pornographic video.

43.    To overcome its victims' obvious reservations, GirlsDoPorn created a scheme that relied heavily on fraud, coercion, and intimidation, and which it used to locate and recruit all of its victims.  The scheme, which GirlsDoPorn honed over the years, included: (a) drawing women in through bait-and-switch advertisements for clothed modeling; (b) offering (although most times never paying in full) enough money to overcome the woman's general compunction against the idea of participating in pornography; (c) lying about the utmost concern the victims have—where and how the video will be distributed and who will be able to view it—by claiming it would never be available online and would instead be sold on DVD's in foreign countries or given to a private collector; (d) paying and coaching fake reference models to earn the victim's trust and reassure the victim that, like their own videos that they claimed to have filmed, the victim's video will never be online or available to anyone in the United States, and that the victims will remain anonymous; (e) concealing the websites and their own identities at every stage of the recruiting and filming process; (f) curtailing the women's ability to investigate or discover the truth; and (g) using legal threats to stifle the victims' ability to seek redress through the courts.

---

[11] The United States also charged Wiederhold with sex trafficking violations, to which he plead guilty on or about April 12, 2024.

### ii.    The False and Misleading Craigslist Advertisements

44.    GirlsDoPorn predominantly posted advertisements on Craigslist.com purporting to seek young women for clothed modeling work.  The facially benign advertisements offered eighteen to twenty-two-year-old women with little-to-no modeling experience a relatively large sum of money to apply for modeling jobs.  The advertisements directed prospective models to sham modeling websites, such as BeginModeling.com, ModelingGigs.com, and ModelingWorks.com, all of which were owned by GirlsDoPorn and which appear to be for clothed modeling work.  Neither the Craigslist.com advertisements nor the sham modeling websites contained any indication that nudity was involved, let alone pornography.  The websites contained an application form directing the prospective victims to upload pictures and provide their contact information (email, phone number, and address).

45.    In 2010, GirlsDoPorn publicly admitted to using deceptive modeling advertisements to lure victims to hotel rooms.  The caption for a victim's video published on the public portion of GirlsDoPorn's website read:

> This smokin hot 18 y/o teen named jessica was trying too find some money so that she could get a boob job done.  **She contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha :)**  (sics in original, emphasis added.)

46.    GirlsDoPorn continued to use bogus clothed modeling advertisements and sham clothed modeling websites to attract victims, including Plaintiffs, until it was shut down in October 2019.

### iii.    The Deceptive Emails to Get Victims to Answer Their Calls

47.    If the photographs submitted to the sham modeling websites and age of the victim met GirlsDoPorn's criteria (attractive and under twenty-two years old), GirlsDoPorn responded with several different stock emails.  Since the emails were in writing, GirlsDoPorn used deft wording, fake names for the employees, and obscured the true nature of the job, never using the word pornography, never mentioning its websites,

and never disclosing where it would distribute the final product.  Instead, the emails stated: "[t]his is a legitimate adult gig for an established Southern California company" and "[a]ll the girls that I shoot are first times.  I shoot cheerleaders, sorority girls, preppy college girls, [Instagram] models with 70k followers and models of that caliber."

48.    If the prospective victim did not respond to this initial email, GirlsDoPorn sent a follow-up email increasing the amount of pay and offering "$300 if you want to do clothed modeling," even though clothed modeling was never on the table.  The entire purpose of the vague emails was to get the victim to answer the phone so GirlsDoPorn could begin its campaign of lies without the fear of a paper trial or to get the victim to travel to a hotel where GirlsDoPorn would meet the victim, get her alone in a hotel, and then coerce her into filming pornography.

### iv.    The Lies on the Phone

49.    Once on the phone, GirlsDoPorn would feel out the victim before broaching the topic of pornography, such as asking if they were comfortable doing lingerie shoots or nudity, even though these were never an option.  GirlsDoPorn would tell the victim she could earn thousands of dollars if she filmed an "adult video" but immediately and falsely reassured the victim that the video would never be published online or seen by anyone in North America since the videos would only be distributed on DVD in a foreign country, typically Australia or New Zealand.  Pratt and Wolfe have New Zealand accents, which helped sell this lie.  GirlsDoPorn played with different lies to see which were more successful.  For a period of time, GirlsDoPorn told its victims that the videos were for a wealthy individual in Australia who commissioned the videos.  While the details of GirlsDoPorn's representations varied slightly, the part of the message that mattered most to the prospective models remained the same— "the video is not going online, and no one in the United States will find out."

### v.    GirlsDoPorn Paid the "Reference Models" to Lie to Victims

50.    Prospective victims were naturally skeptical of GirlsDoPorn's promises of anonymity made over the phone.  However, to help sell their lies, GirlsDoPorn paid other

young women (referred to as "reference models") to reach out to the victim and assure her that her privacy and anonymity would remain intact.  Through text messages, phone calls, and/or over Facetime, the reference model would tell the prospective victim she had already filmed videos for the company, the footage was never leaked online, and the content had never been discovered by anyone in their lives.  The reference models shared their social media accounts and other personal details with the victims to earn their trust and as proof that the reference models were who they said they were.  However, unbeknownst to the victim, GirlsDoPorn coached and paid the reference models to lie about distribution and to conceal GirlsDoPorn's true identity, as a simple Google search of the term "GirlsDoPorn" leads to GirlsDoPorn's website; hundreds of videos branded with GirlsDoPorn's logo published on miscellaneous tube sites and freely accessible to anyone in the United States; and several firsthand horror stories from GirlsDoPorn's previous victims on Reddit, Facebook, and elsewhere.

51.     Kailyn Wright acted as a reference for dozens of victims, even though she knew the truth about GirlsDoPorn.  In the State Court Action, Wright testified that GirlsDoPorn instructed her "to tell [prospective victims] it would not be going online and that it was going overseas to wealthier countries."  When asked why she told women the videos would not be released online knowing it was false, Wright testified, "Because that's what they told me to say.  That's what they were paying me to say."

52.     Amberlyn Clark, a girlfriend of Garcia's, never filmed a video for GirlsDoPorn.  She testified in the State Court Action that Garcia helped her create a fake backstory about how she was from a small town, filmed several videos for the company, and none were released online or in the United States.  Garcia instructed Clark to tell prospective models that the videos "wouldn't be put online and that they would go to private collectors" located "[o]utside of the U.S."  Garcia also advised her to assure models that "no one would find out."  Finally, Garcia instructed her to never mention the name GirlsDoPorn or use his real name.

///

### vi.   The False Promises of Payment

53.   In addition to lying about distribution, GirlsDoPorn increased the offer until the victim agreed to fly to San Diego for the shoot, with no intention of actually paying in full.  GirlsDoPorn's assistant, Valorie Moser, testified in the State Court Action that Pratt asked her to recruit several "super hot" women who submitted applications to the fake modeling websites, but whom he and Garcia could not convince to fly to San Diego. Pratt instructed Moser that, once on the phone with these prospective victims, she should "[m]ake an offer of a price that was high enough to get the model on a plane."  However, even before the victim arrived in San Diego, Pratt had graded the victim as an "A, B, or C model" based on her attractiveness and youth and already knew GirlsDoPorn would not pay the inflated price.  Once the victim was alone in a hotel room in San Diego, GirlsDoPorn (usually Garcia) routinely fabricated an excuse to pay the victim less, for example, by claiming the victim had cellulite, bruises, scars, or uneven breasts.  If a victim complained, GirlsDoPorn chastised her for submitting misleading pictures and told her she had to pay for the cost of the hotel and flight if she did not accept less.

54.   If the reference women, promises of thousands of dollars, and other lies were not sufficient to get the victim to agree to fly to San Diego, GirlsDoPorn offered the victim a modeling gig to get them to San Diego and then, alone in a hotel room, use an arsenal of tools to coerce them into filming a pornographic video, including threatening legal action and canceling return flights.

### vii.   In-Person Coercion and Deceit in San Diego

55.   GirlsDoPorn coached its makeup artists, drivers, and cameramen on how to answer victims' questions about who they are and whether the video will leak online.  If asked, the employees were initially instructed to confirm the video would not be online. Like the fake reference models, GirlsDoPorn coached the employees to never mention the name GirlsDoPorn and to reassure models that everything would be fine.

56.   GirlsDoPorn's long-time San Diego, California-based corporate attorney, Aaron Sadock, who was also Pratt's long-time personal attorney, forced all employees

and contractors to sign Non-Disclosure Agreements and advised them that the agreements prevented them from telling victims they interacted with the true nature of the business.  After victims sued GirlsDoPorn in 2016, Sadock coached the employees on how to give deceptive answers to questions about distribution and the company's identity.  Consequently, after June 2016, when victims asked GirlsDoPorn's drivers, cameramen, and makeup artists about distribution or the name of the company, the victims received the same false assurances about anonymity promised over the phone and by reference models and deft, misleading attorney-crafted responses that evaded providing any material information to alert the victim as to who the individuals were or the true nature of the their intentions.

57.     In the hotel room, GirlsDoPorn furnished victims with alcohol, marijuana, and depressants (such as Xanax) in order to "loosen up."  Just minutes before filming and usually after the victims were intoxicated, GirlsDoPorn presented the victims with at least one document to sign.  GirlsDoPorn did not permit the women to thoroughly read or review the document(s) before signing them, oftentimes telling the victims the document(s) merely confirmed the agreement they had already reached over the phone. In other instances, GirlsDoPorn told the victim the documents were "just to prove that [she is] 18," to show they were "not forcing [her] to do this," or "this is just about the basic agreements, everything we spoke about," or "just kind of a formality."

58.     GirlsDoPorn intentionally waited until the last minute to present the document(s) to the victim (which easily could have been emailed before the victim traveled to San Diego) to create a false sense of urgency, telling many victims that they were "behind schedule" and that the victim needed to hurry up and sign the document(s). Garcia, Wolfe, and/or Pratt also got irritable and aggressive when victims asked questions about the document(s) or requested time to read.  Sometimes, GirlsDoPorn conducted videotaped interviews, peppering the victims with questions as they tried to read the contract and fill out the information.

///

---

59.     Even if the victims were given all the time in the world to read the contracts, the document(s) do not directly contradict the express promises about distribution. The document(s) contain broad, vague release language couched in disorganized, complicated legalese and only mentions the innocuously named shell entities that GirlsDoPorn maintained (*e.g.,* Bubblegum Films, Inc. or Oh Well Media, Limited) as the contracting party.  Thus, Google searches done in hotel rooms by several victims led to innocuous websites set up by GirlsDoPorn for these shell entities rather than GirlsDoPorn.com or its public channel on www.PornHub.com.

60.     While filming the sexual portions of the video, some victims asked to stop, but the actor and videographer did not permit it.  They told women they could not leave until they had the footage they wanted, often falsely saying the victim was contractually obligated to finish and that she would be forced to repay them for the costs of production if she did not proceed.  If a victim was grimacing or showing signs of distress during a scene, GirlsDoPorn forced the victim to refilm the segment, hide any pain she was experiencing, and act as if she was enjoying it.  This often caused filming to last for four or five hours.  At times, Garcia and Pratt became aggressive and agitated if a woman hesitated to perform an act or asked to leave.  Once in the hotel room, the victims lacked any feasible means of egress until GirlsDoPorn released them.

### viii.   GirlsDoPorn's Distribution, Doxing, and Immense Profits

61.     GirlsDoPorn published the full-length videos in the "members area" of its paysites, GirlsDoPorn.com, and GirlsDoToys.com.  Once published on its paysites, GirlsDoPorn used an aggressive marketing strategy to as many views as possible. Aware that the victims' classmates, friends, and coworkers would be keen on paying to view the full-length video, GirlsDoPorn intentionally sent (or recklessly knew others would send) links to the victims' trailer videos to social media accounts of people in the victims' social circles, including friends, family, co-workers, employers, teachers, and classmates. By sending links to trailer versions of the video to people who knew the victim, those people then shared the links with others acquainted with the victim, thereby causing the

videos to go viral amongst everyone the victim knew within 24 to 48 hours of the video being released.  By making the video go viral, GirlsDoPorn sold monthly subscriptions to customers who had zero interest in subscribing to GirlsDoPorn (or any other monthly pornography paysite for that matter), but who simply wanted to see the victims' full-length video out of curiosity.

62.    GirlsDoPorn had something of a cult following.  Numerous websites and forums existed for the sole purpose of doxing[12] GirlsDoPorn's victims.  Anonymous Internet users (a.k.a. "trolls") created and congregated on online forums where the sole purpose was to identify GirlsDoPorn's victims by name, glean personal information about them, and harass them.  The trolls shared any information they could find on the forums, including the model's name, email address, high school, biographical information, and links to the victims' and their families' social media accounts.  Armed with the woman's social media and contact information, trolls sent links to the victim's video to people connected to her on social media.  Other trolls contacted the women personally to attack, bully, shame, and sexually proposition them.  Some trolls contacted and harassed the victims' family members, friends, classmates, and church members.

63.    PornWikiLeaks.com was the most notorious doxing website in the pornography industry.  Adult film actors work hard to keep their personal information private to avoid harassment (or worse) from stalkers. PornWikiLeaks.com's business model was to dox people in the pornography industry, such as by publishing their real names and addresses, and then charge a fee to remove the information from the site.

64.    GirlsDoPorn's victims were doxed on PornWikiLeaks.com as early as 2012. The doxing of GirlsDoPorn's victims became so great in PornWikiLeaks.com's general forum that, in July 2015, PornWikiLeaks.com created a special forum dedicated solely to

---

[12] Merriam Webster defines "dox" (däks, *slang*) as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge."  *See* https://www.merriam-webster.com/dictionary/dox.

GirlsDoPorn's victims called, "Girlsdoporn.com GDP Girls Do Porn Exposed real names and personal family info."

65.     By early 2016, the special GirlsDoPorn forum had hundreds of thousands, if not millions, of posts and comments related to GirlsDoPorn's victims. The traffic generated by this forum was so high that, in November 2015, GirlsDoPorn purchased PornWikiLeaks.com to use as a marketing tool for its paysite.  In January 2016, advertisements containing hyperlinks to GirlsDoPorn's subscription paysites began appearing in the GirlsDoPorn forum.

66.     Some posts on PornWikiLeaks.com were narratives from GirlsDoPorn's victims detailing the fraud and coercion used by GirlsDoPorn as part of its recruitment and filming process.

67.     The doxing forums, virality of the videos, and trailer videos on various tubesites created significant traffic to GirlsDoPorn's paysite, where it maintained ten to fifteen thousand subscribers per month.  The Federal Bureau of Investigation estimates GirlsDoPorn made over $17,000,000 from its sex trafficking operation.[13]

## C.    DEFENDANTS KNOWINGLY ASSISTED, SUPPORTED, AND FACILITATED GIRLSDOPORN'S SEX TRAFFICKING VENTURE

68.     Section 1591 defines sex trafficking as "knowingly . . . recruit[ing], entic[ing], harbor[ing], transport[ing], . . . or solicit[ing] by any means a person . . . knowing, or, . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion[,] or any combination of such means will be used to cause the person to engage in a commercial sex act."  18 U.S.C. § 1591(a)(1).  GirlsDoPorn's consistent use of fraud, intimidation, and coercion to induce women to film pornography constitutes criminal sex trafficking— as evident from the six guilty pleas and lengthy prison sentences.

---

[13] *See* Press Release, GirlsDoPorn Owners and Employees Charged in Sex Trafficking Conspiracy, Dept. of Justice (Oct. 10, 2019), *available at* https://www.justice.gov/usao-sdca/pr/girlsdoporn-owners-and-employees-charged-sex-trafficking-conspiracy.

69.    A person also commits criminal sex trafficking if he or she "knowingly . . . **benefits, financially or by receiving anything of value, from participation in a venture** which has engaged in an act [of sex trafficking]" while "knowing or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion[,] or a combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2) (emphasis added). Section 1591 defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C. § 1591(e)(4). "The term 'commercial sex act' means any sex act, on account of which anything of value is given to or received by any person." *Id*. subsection (e)(3).

70.    Defendants, and each of them, violated Section 1591(a)(2) by knowingly participating in and benefitting from GirlsDoPorn's criminal sex trafficking venture.

71.    CCBill was the ISO, and Epoch was the PayFac who serviced GirlsDoPorn's Merchant Accounts. TSYS and First Data were the Payment Processors who facilitated the payment to GirlsDoPorn. And the Bank Does settled the payments for GirlsDoPorn. In so doing, Defendants processed millions of dollars in revenue sent to GirlsDoPorn for its Section 1591-violative videos, including videos of Plaintiffs. Not only did processing payments amount to knowingly benefitting from a sex trafficking venture in violation of 18 U.S.C. 1591(a)(2), but Defendants' payment processing turned the victims' sex acts into "*commercial* sex acts" as defined by 18 U.S.C. §1591(e)(3). Without Defendants' payment processing services, the GirlsDoPorn sex trafficking venture would not have been a commercial enterprise. Plaintiffs are informed and believe all revenues generated from the GirlsDoPorn sex trafficking venture were processed by Defendants.

72.    Given the integral role of payment processing to the business of Internet pornography, GirlsDoPorn would never have become or remained a viable enterprise absent Defendants' participation in the sex trafficking venture. GirlsDoPorn would never have achieved the level of success it did without Defendants actively assisting, supporting, and facilitating its unlawful business with streams of revenue.

**D.     DEFENDANTS EARNED MILLIONS IN FEES AND OTHERWISE MATERIALLY BENEFITTED FROM THEIR PARTICIPATION IN GIRLSDOPORN'S SEX TRAFFICKING VENTURE**

73.     Given their underwriting, transaction monitoring, risk monitoring, and fund transfer approvals for GirlsDoPorn's Merchant Accounts and Submerchant Accounts, Defendants knew or should have known GirlsDoPorn was a sex trafficking venture.  And Defendants' revenue from accepting payments for GirlsDoPorn was revenue derived from a sex trafficking venture.  CCBill, in particular, amassed millions of dollars in fees because GirlsDoPorn qualified as a high-risk "adult [M]erchant account" subject to higher payment processing fees.[14]

74.     Courts recognize that Plaintiffs plausibly allege a financial institution's scienter with: (a) direct admissions during account reviews, (b) obvious payment-flow anomalies inconsistent with stated business purpose, (c) receipt of subpoenas or regulatory inquiries, and (d) financial motive to remain willfully blind while continuing to provide core financial rails.

75.     Defendants' percentage-of-transaction fees, reserve withholdings, and setoffs constituted a knowing benefit linked to their facilitation of GirlsDoPorn's venture. Courts treat financial intermediaries' receipt from tainted flows as probative of knowledge and participation.

76.     Even after Defendants were on notice, they generated millions of dollars from their participation in GirlsDoPorn's sex trafficking venture.

**E.     DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT GIRLSDOPORN USED FRAUD, INTIMIDATION, AND COERCION AS PART OF ITS CUSTOMARY BUSINESS PRACTICES THROUGHOUT ITS PARTNERSHIP WITH GIRLSDOPORN**

77.     Although criminal sex trafficking under Section 1591(a)(2) requires a showing that the participant/beneficiary of a sex trafficking venture knew or recklessly

---

[14] *See* https://ccbill.com/industries/adult-business (last visited January 25, 2024).

disregarded the fact that unlawful means such as force, fraud, or coercion was used to cause a victim to engage in a commercial sex act, Section 1595 provides sex trafficking victims with a civil cause of action against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person **knew or should have known** has engaged in an act [of sex trafficking.]"  18 U.S.C. 1595(a) (emphasis added).

78.     As early as July 2009, Defendants knew, or should have known, that GirlsDoPorn was using force, fraud, and coercion to get its victims to engage in commercial sex acts for numerous and separate reasons.  As the years passed, the red flags indicating that GirlsDoPorn was engaged in sex trafficking mounted, and Defendants' ability to claim ignorance of GirlsDoPorn's fraudulent and coercive business practices became less and less viable.

### i.     Defendants Have Specific Underwriting, Transaction Monitoring, and Continued Risk Monitoring Duties Under the Customs of the Payments Industry

79.     As discussed, *supra*, under payments industry customs, such as the Card Brand Rules and the ETA Underwriting and Risk Guidelines, Defendants have specific duties to properly underwrite their Merchants, monitor the transactions, and perform continued risk management duties related to their Merchants' processing activity.

80.     Trade practices, federal statutes, and Card Brand Rules required Defendants to purvey their payment processing services including knowing what type of Merchant they were servicing, what types of goods and services that Merchant was selling, what types of marketing practices those Merchants were using, and whether that Merchant's transactions were complying with applicable federal, state, and local laws, as well as compliant with the Card Brand Rules. Even if Defendants, in particular, were not independently notified of GirlsDoPorn's business practices, because of industry norms, Defendants should have known they were accepting payments related to sex trafficking and deriving revenue from processing payments related to sex trafficking.

ii.     **Summary of Red-Flags Defendants Ignored**

81.     As early as 2009, GirlsDoPorn publicly boasted about both "first-timers," a known high-risk pornography niche, and about bait-and-switch modeling advertisements, which reasonable monitoring is designed to detect.

82.     By the end of 2015, third parties used GirlsDoPorn's content to dox and virally promote the company, amplifying reputational and legal risk, which, again, proactive controls are designed to detect.

83.     From June 2016 through 2019, the State Action alleged fraud and coercion at scale and generated extensive public filings and media coverage, which Acquirer and PayFac monitoring is designed to capture and escalate. Continued processing while possessing knowledge of the ongoing litigation was inconsistent with Defendants' "continuing monitoring" duties.

84.     In or around April 2017, CCBill and Epoch were subpoenaed concerning GirlsDoPorn's processing, which put them on actual notice and triggered a duty to investigate, re-underwrite, and, if warranted, terminate or freeze GirlsDoPorn's ability to use the payment networks.

85.     From October 2019 through 2024, federal prosecutions, guilty pleas, and lengthy sentences confirmed GirlsDoPorn business model depended on fraud and coercion, confirming what Defendants should have known for years.

iii.     **In 2009, GirlsDoPorn Publicly Admitted to Using Fraudulent Tactics to Lure Young Women into a Hotel Room Under False Pretenses**

86.     From the time that GirlsDoPorn.com launched in 2009, anyone paying the slightest attention to the pornography business or doing the slightest due diligence of its business partners (as parties in the Credit Card industry are required to for pornography websites) understood that GirlsDoPorn used force, fraud, and coercion to get its high school and college-aged victims to appear in its pornographic videos.

87.     As of 2010, GirlsDoPorn's homepage indicated:

> Girlsdoporn is the only website that uses only 100% amateur girls.  There are a lot of websites out there that <u>claim</u> they have first timers only. I myself have joined these kinda websites and then days later started recognising the girls on other websites all over the internet and been dissapointed . This is why I built Girlsdoporn.com here you will find nothing but amateurs. I refuse too shoot any girls who have prior exerience . All the girls you will finrised d on my site are normal everyday girls you would find in the city streets - malls - colleges and normal 9-5 jobs . I personally hunt out each and every one for your viewing pleasure. You would be suphow quickly the offer of quick cash turns these girls into part time pornstars. Everything you read or see on this website is 100% real and true. We have no need too trick or lie too you.. ENJOY GUYS !

(Sics in original.)

88.    GirlsDoPorn's niche of teenage women filming their first and only pornographic video is enigmatic in that most, if not all, women attending high school or college would never agree to appear in a sex video that would be published on dozens of free websites easily accessible to friends, family, classmates, and employers.  Not long after GirlsDoPorn launched its website in 2009, GirlsDoPorn publicly – on its own website – laughed about fraudulently inducing a victim to a hotel room under the false pretense of a clothed modeling job:

> **This … 18 y/o teen … contacted us regarding an add I had placed for beauty models wanted , having no idea it was actually for adult videos instead ha** :)

(Sics in original, emphasis added.)

89.    These posts were available to Defendants when they entered a contractual relationship with GirlsDoPorn and began processing payments for videos featuring GirlsDoPorn's victims.  Upon information and belief, Defendants did no due diligence regarding GirlsDoPorn's business practices prior to partnering with GirlsDoPorn.  Had they done so, it would have been apparent that GirlsDoPorn was a sex trafficking venture or at least warranted further investigation into or heightened monitoring of GirlsDoPorn.

### iv.    GirlsDoPorn's Videos Contain Obvious Indicia of Fraud

90.    The content of GirlsDoPorn's videos shows that GirlsDoPorn lied to the young women about the publication of the video.

91.    All GirlsDoPorn videos begin with a five to ten-minute "interview" of the victim.  The victim's responses in the interviews made clear that she believed the video would not be published on the Internet or available to anyone in the United States.

92.    Further, no content or dialogue in the interviews clarified that the production company was GirlsDoPorn or revealed that the subject videos would be posted on GirlsDoPorn.com (or any website, for that matter).  Finally, in these interviews, the women often expressed how they would be ostracized if the video was made public—something GirlsDoPorn knew would occur *en masse* once the video was published and marketed for purchase on GirlsDoPorn's websites, especially considering the doxing occurring on PornWikiLeaks.com, which, as mentioned above, was a notorious website known to all in the pornography industry.

### v.    GirlsDoPorn's Videos Contain Obvious Indicia of Coercion

93.    The video content made clear that the victims were subjected to coercion and did not consent to all the sex acts portrayed in the videos.  Some of GirlsDoPorn's videos depict victims who are in visible distress, including, in some instances, bloodstained sheets and condoms.  In other videos, tracks of the victim's tears can be seen in the victim's makeup—the victim obviously having been in tears while the camera was not rolling or having been edited out by GirlsDoPorn.  In some videos, furniture can be seen piled in front of the hotel room door.  Since at least 2016, numerous online forums available from a simple Google search of "girlsdoporn" detailed these signs of duress at length.  If Defendants had done their due diligence—as they are required by law and industry regulation  to do—they should have seen and been alarmed by this content and not partnered with GirlsDoPorn.

///

///

### vi.     GirlsDoPorn's Videos Contain Obvious Use of Alcohol and Drugs

94.     Some of GirlsDoPorn's videos feature women under twenty-one years old who are clearly under the influence of drugs and/or alcohol based on the victim's gait, blurred eyes, and slurred speech.  Alcohol and marijuana paraphernalia are visibly strewn about the hotel room in the background of videos.  Again, had Defendants done their due diligence, they should have been aware that women in GirlsDoPorn's videos were frequently under the influence, and not processed GirlsDoPorn's customer payments.

### vii.     GirlsDoPorn's Videos Contain Clear Signs of Sex Trafficking Minors

95.     On at least two occasions, GirlsDoPorn filmed a victim on her 18th birthday. Both times, GirlsDoPorn presented the victim with a cake to highlight the fact that it was the victim's 18th birthday.  Since the victims filmed on their 18th birthdays, it was obvious to anyone that GirlsDoPorn recruited, enticed, harbored, transported, and solicited these victims to fly to San Diego to perform commercial sex acts while they were only 17 years old.  The mere act of soliciting or transporting a minor for the purposes of engaging in a commercial sex act violates Section 1591 even if the sex act is not yet performed. Plaintiffs are informed and believe that several of GirlsDoPorn's victims were not only minors when GirlsDoPorn solicited and transported them but were also underage when they were filmed.

### viii.     GirlsDoPorn Made Publicly Available Statements Containing Admissions of Unlawful Acts

96.     Beginning in or around 2014, GirlsDoPorn operated an online forum that included firsthand accounts of the fraudulent and coercive tactics it used. For example, the forum included an account directly from GirlsDoPorn's owners of a woman who "flip[ed] out in the middle of the shoot [and] had a panic attack" when she "had enough" and locked herself in the bathroom to avoid continuing with the filming process.  In the narrative, GirlsDoPorn mocked the victim for calling her mother for help and described their efforts to convince her to finish the scene.  GirlsDoPorn joked about the woman being so upset that she disappeared from the hotel room and was never heard from again.

97.    GirlsDoPorn published this post in its forum in or around March 2015, where it remained live and publicly available until the forum was taken down in or around January 2020.

### ix.    Several Victims Publicly Posted Survival Stories Describing GirlsDoPorn's Unlawful Acts

98.    Numerous victims came forward publicly to detail the force, fraud, and coercion they underwent from GirlsDoPorn.  In 2016, one victim published a detailed account of the fraud on Reddit, which was available to Defendants.  The post read:

> One day, I answered an ad for "beginmodeling.com" and after that, my life would never the same. From the minute Johnathan contacted me, I was lied to repeatedly, manipulated, and coerced into filming. A fake website, fake references from "past models", the entire premise is a lie.
>
> [. . .]
>
> He'll convince you that no one will ever see it, it's for Australia/foreign markets only, it's only released on DVDs, etc. I knew nothing about the industry before this, how was I to know I was being naive? If you refuse, they tell you you'll have to reimburse them for the flight/hotels. You're all alone, surrounded by people you don't know, and you only have one choice. Dre will offer to smoke with you, Johnathan will offer you a drink, before you know it, they've got cameras out and they're recording you. They read you lines.  "I am not under the influence and I consent to the filming.."  They're pulling out contracts. They don't give you time to read them. "Begin Modeling" is written at the top. Why? This isn't modeling at all! They give you a little script for your pre-interview. They tell you exactly what to say if you won't say what they want you to. It's all fake.  They are extremely smart. And extremely manipulative.
>
> [. . .]
>
> I cry at one point. They switch angles so you can't see my face. I start to bleed. They switch again, and then abandon the sex all together.  "Do you know what a facial is?" I didn't.

### x.    Twenty-Two Victims Filed a Lawsuit Detailing GirlsDoPorn's Unlawful Practices, Which Received Extensive Media Coverage

99.    As mentioned above, on June 2, 2016, four Plaintiffs sued GirlsDoPorn for fraud and privacy claims in the State Court Action.  By March 2017, there were twenty-two Plaintiffs in that case.  The lawsuit garnered significant press coverage.  Each of the Plaintiffs in the State Court Action filed numerous public declarations detailing the fraud and coercion they underwent.  As early as 2017, the San Diego Superior Court found that the Plaintiffs were more likely than not going to prevail at trial.

100.    In January 2019, Hon. Joel R. Wohlfeil found the plaintiffs' fraud claims were supported by "clear and convincing evidence" and that there was a "substantial probability" the plaintiffs would prevail on those claims at trial.  Based on the findings, the San Diego Superior Court issued an order allowing the Plaintiffs to do pretrial financial discovery for punitive damages under Civil Code section 3295.

101.    Despite its knowledge of the ongoing State Court Action, Defendants continued to profit from GirlsDoPorn videos, completely ignoring the dozens of public declarations, hard evidence of, and Court orders supporting GirlsDoPorn's fraud and coercion.

### xi.    CCBill and Epoch Were Served with Subpoenas in the State Court Action and Michael Pratt Contacted CCBill's Legal Department about the Subpoenas

102.    In April of 2017, the Plaintiffs in the State Court Action served defendants CCBill and Epoch with subpoenas seeking documents related to its credit card processing for GirlsDoPorn.

103.    On April 26, 2017, Michael Pratt contacted defendant CCBill to discuss the State Court Action subpoena.

///

///

///

**F.    DESPITE THEIR KNOWLEDGE OF GIRLSDOPORN'S UNLAWFUL BUSINESS PRACTICES, DEFENDANTS MAINTAINED THEIR PARTNERSHIPS WITH THE SEX TRAFFICKING VENTURE FOR YEARS**

104.    Despite the aforementioned independent reasons that Defendants knew, acted in reckless disregard of the fact, and/or should have known that GirlsDoPorn was engaged in sex trafficking, Defendants continued their respective partnerships with GirlsDoPorn.[15]

105.    By maintaining their partnerships with GirlsDoPorn, Defendants encouraged GirlsDoPorn to continue sex trafficking more and more women.

106.    In October 2019, when federal authorities indicted the owners and operators of GirlsDoPorn on federal sex trafficking charges and shut down its website, Defendants technically ended their partnerships with GirlsDoPorn because at that point, there was no company left.

107.    Defendants' officers, directors, and managing agents were aware that non-consensual content was rampant on GirlsDoPorn's website, but refused to terminate their contractual relationship with GirlsDoPorn.  Accordingly, Defendants' officers, directors, and managing agents not only ratified the presence of non-consensual content, including Plaintiffs' videos, on GirlsDoPorn's website, but they actively encouraged it.

108.    If any officers, directors, or managing agents of Defendants were not aware of GirlsDoPorn's sex trafficking venture, such ignorance was deliberate, and directly caused by their failure to implement internal policies regarding oversight of its partners' profit-seeking activities, including GirlsDoPorn—an admittedly "high risk" client.

**G.    DEFENDANTS KNOWINGLY PROFITED FROM GIRLSDOPORN'S SEX TRAFFICKING VENTURE**

109.    Knowingly and for financial benefit, Defendants facilitated payment

---

[15] Notably, PayPal and other processing entities terminated their business relationship with pornography websites.  Defendants were already aware of this issue and yet continued to knowingly do business with GirlsDoPorn.  *See* http://www.thetimes.co.uk/article/paypal-cuts-off-porn-site-that-ran-child-abuse-videos-98j2bdnjt.

processing for GirlsDoPorn's websites featuring the illicit videos. Defendants were each uniquely situated to end GirlsDoPorn's sex trafficking venture.  Yet, each of them chose to knowingly do business with the illicit enterprise and financially benefit from it.

110.  Defendants earned subscription and/or a percentage-per-transaction fees (sometimes up to 15%) in exchange for facilitating payments for GirlsDoPorns' websites. In essence, for every GirlsDoPorn transaction of one hundred dollars, Defendants earned up to fifteen dollars.

111.  Defendants' officers, directors, and managing agents were aware the processors benefited from their partnership with GirlsDoPorn, but refused to stop processing payments for the illicit videos so they could reap the financial gains.

## VI.

## CAUSE OF ACTION

## 18 U.S.C. § 1595

### (All Plaintiffs Against All Defendants)

112.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

113.  GirlsDoPorn was a "sex trafficking venture" within the meaning of Sections 1591 and 1595.  GirlsDoPorn recruited, enticed, harbored, transported, provided, obtained, advertised, maintained, patronized, and/or solicited Plaintiffs and those similarly situated, knowing a combination of force, threats of force, fraud, coercion, and/or threatened abuse of law and legal proceedings would be used to cause them to engage in commercial sex acts.  GirlsDoPorn had a custom and practice of using force, threats of force, fraud, coercion, and/or threatened abuse of legal proceedings as part of its recruiting and filming practices and used such practices in recruiting the overwhelming majority, if not all, of its victims.

114.  Plaintiffs are victims of GirlsDoPorn's sex trafficking venture within the meaning of Sections 1591 and 1595.

///

115.    As early as 2009, and definitely by 2016, Defendants knew, acted in reckless disregard of the fact that, or, at the bare minimum, should have known GirlsDoPorn operated a sex trafficking venture that used a combination of force, threats of force, fraud, and coercion to get its victims to engage in commercial sex acts within the meaning of Section 1591.

116.    Defendants knowingly participated in GirlsDoPorn's sex trafficking venture withing the meaning of Section 1591 and 1595 by, *inter alia*:

a.    Assisting GirlsDoPorn in commercializing the sex acts by processing Credit Cards on GirlsDoPorn's websites featuring videos of the commercial sex acts;

b.    Facilitating financial transactions and distributing funds to GirlsDoPorn for the illegal videos;

c.    Refusing to end their respective partnerships with GirlsDoPorn when Defendants learned GirlsDoPorn used force, fraud, and coercion to induce the women to engage in the sex acts that Defendants commercialized through their payment network; and

d.    Failing to report GirlsDoPorn's sex trafficking venture to law enforcement authorities.

117.    Defendants knowingly benefitted from GirlsDoPorn's sex trafficking venture in general and from the sex trafficking of Plaintiffs in particular by earning millions of dollars in fees.

118.    Defendants' actions and inactions described above violated Section 1591(a)(2).[16]  Defendants also aided and abetted GirlsDoPorn's violations of Sections 1591(a)(1) and (2).  Additionally, Defendants violated Section 1594(c) by conspiring with GirlsDoPorn to violate Sections 1591(a)(1) and (2).

---

[16] Plaintiffs bring this action against Defendants under Section 1595 as both perpetrators and participants in the GirlsDoPorn sex trafficking venture. See, *G.G. v. Salesforce.Com, Inc.* 76 F.4th 544 (7th Cir. 2023) ("Section 1595 creates two kinds of civil liability: perpetrator liability and participant liability.")

119.    As a proximate result of Defendants knowingly benefitting financially and participating in the GirlsDoPorn sex trafficking venture, Plaintiffs have suffered damages, including, but not limited to, severe emotional distress, significant trauma, attempted suicide, and social and familial ostracization.  Further, Defendants have received ill-gotten gains by profiting and benefiting from the commercialization of the illicit videos featuring Plaintiffs and the class members.

120.    Defendants' actions were intentional, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of Plaintiffs' rights.  Plaintiffs are entitled to punitive damages to punish Defendants for their actions and to deter others from acting similarly in the future.

## VII.

## PRAYER FOR RELIEF

WHEREFORE, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 demand individually, and on behalf of the GirlsDoPorn Class, that the Court enter judgment in their favor and against the Defendants, jointly and severally, as follows:

a.    Certifying this action as a class action, proper and maintainable, pursuant to Federal Rule of Civil Procedure 23, declare that Janes Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 are the proper class representatives, and appoint Janes Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3's counsel as class counsel;

b.    Awarding Plaintiffs compensatory damages in an amount that exceeds one million dollars for each member of the class;

c.    Awarding Plaintiffs restitution for all monies CCBill and Epoch earned by profiting and benefiting from the monetization of Plaintiffs' videos;

d.    Awarding Plaintiffs punitive damages;

e.    Awarding Plaintiffs their attorney fees;

f.    Awarding Plaintiffs their costs and expenses;

g.    Awarding Plaintiffs pre-judgment and post-judgment interest;

h.      Permanently enjoining the Defendants from profiting from Plaintiffs' videos; and

i.      Granting such other and further relief as this Court deems just and equitable.

## VIII.

## __DEMAND FOR JURY TRIAL__

Plaintiffs demand a jury trial for all triable issues of fact.


RESPECTFULLY SUBMITTED:


Dated: October 13, 2025                    By:     _/s/ Brian M. Holm_
                                                    BRIAN M. HOLM
                                                    _brian@holmlawgroup.com_
                                                    JOHN J. O'BRIEN
                                                    _obrien@tbmlawyers.com_
                                                    CHRISTPHER R. DRYDEN
                                                    _cdryden@attorneygl.com_
                                                    JAMES C. HUBER
                                                    _jhuber@attorneygl.com_
                                                    **Attorneys for Plaintiffs**